Kieschnick v. State 










[WITHDRAWN]





IN THE
TENTH COURT OF APPEALS
 

No. 10-94-346-CR

     NOBLE LEE KIESCHNICK,
                                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                                              Appellee
 

From the County Court
Somervell County, Texas
Trial Court # 3760-M
                                                                                                    

DISSENTING OPINION
                                                                                                    

      I dissent because I do not believe that the evidence was legally sufficient to establish that
Kieschnick intended to deprive the Simpsons of the value of the dogs. I disagree with the
majority's assumption that both points of error "essentially rely on the claim that the State failed
to prove that the Simpsons owned the particular dogs that were in the Kieschnick's possession,"
because I believe "identity" of the dogs and "intent to deprive the owner of property" are two
distinct and separate issues.
      Even though this matter turned into a criminal charge rather hurriedly without the Simpsons
or any law enforcement agencies ever identifying the dogs when this could have been
accomplished by a search warrant or other discovery procedures, I assume for the purposes of this
dissent that the dogs in question were actually the same dogs that left the Simpson's premises.
      There is no evidence in this record, however, that the dogs were stolen from the Simpson's
premises. In fact, the testimony reveals that Kathy Marie Singletary's mother found these dogs
on a dirt road between Glen Rose and Walnut Springs on Sunday, July 17, 1994. Kathy began
to try to find "some people that might have a big heart" to take the dogs. She first went to a golf
course in Glen Rose and couldn't find anyone who would take a pair of dogs. Next, she waited
at the sheriff's department for the animal control officer, but after a long wait, decided that if no
one claimed the dogs from the animal control officer in three days that they would be put to sleep,
so she contacted Sheryl West who worked at a veterinary clinic. Sheryl West agreed to take the
dogs to the clinic to board them until the owners could possibly be found. Sheryl West described
the dogs as being infested with fleas and ticks and the female as having a lot of hair loss. She
testified that these were not the type of dogs that people would abandon, so she made efforts to
find the owners by contacting the animal control officer and by doing a computer search of the
office records of people who owned Chinese pugs. After boarding the dogs for two weeks without
having any success in finding the owner, it was determined to find someone who would "adopt"
the dogs. A clinic employee contacted Shelly Lemays about adopting the dogs. Ultimately,
Shelly's sister, Julie Kieschnick, "adopted" the dogs. So, the Kieschnick's obtained the dogs from
the veterinary clinic apparently under the belief that the dogs were lost or abandoned and that the
owner could not be found. There is no evidence that at the time Julie took the dogs that she
intended to deprive the owner of the dogs. The owners were unknown at that time. According
to Julie's testimony she had expended $350 on veterinary bills for the dogs and an additional $150
for collars, food and dog beds. Julie had the dogs for over a month before getting word from her
sister that the Simpson's were claiming they owned the dogs and wanted them returned.
    Julie had previously owned a Chinese pug that had died two years before and this was her
reason for wanting the dogs. Julie apparently became very attached to the dogs and did not want
to give them up; however, she stated in her testimony she was willing to return the dogs to the
Simpson's upon proper proof of ownership and being reimbursed for her expenses. Julie testified
that she never refused to let anyone come and look at the dogs, even though the only time
suggested by Mrs. Simpson was a workday for Julie. No other date was suggested and apparently
the Simpson's went immediately to the sheriff's department to file the complaint which became
the basis for this prosecution. After the sheriff's department became involved, there was no effort
to obtain the dogs from the Kieschnick's or to arrange for the alleged owners to see and identify
the dogs. At the time of trial, the Kieschnick's were still in possession of the dogs and each
testified of their willingness to allow the dogs to be seen. Deputy Sheriff Ransom testified that
he tried to mediate the matter to reach a settlement without the matter going to court. When
Deputy Ransom first called the Kieschnick's telephone number he received a taped recording and
left a message, which Mr. Noble Kieschnick returned. After Deputy Ransom told Kieschnick who
he was, Kieschnick gave him his full name and address in Cedar Hill. After obtaining the
Kieschnick's address, however, no effort was made to view the dogs or confiscate them. In Noble
Kieschnick's testimony he stated that he had requested a photograph of the Simpson's with the
dogs as proof of their ownership. Even though other methods of proof might have been
satisfactory, this was what he suggested at that time. It is common knowledge that pets will
usually come to their owners, but no effort was ever made by the sheriff's department to have the
Simpsons view the dogs.
      Even though Noble Kieschnick had refused to give his last name to anyone until Deputy
Ransom talked to him, certainly his address would have been readily available to law enforcement
since they had his telephone number. Considering all the circumstances involved in this case, one
cannot conclude that the Kieschnick's were hiding the fact they had the two Chinese pugs which
Julie obtained from Dr. Mike Jones' veterinary clinic. Certainly, these facts do not resemble the
classic dog theft cases where a thief steals and conceals a dog for a reward or ransom. There was
no evidence that Noble Kieschnick intended to exact a reward or other compensations for the
Chinese pugs when the dogs were obtained by his wife, Julie, from Dr. Jones. Compensation only
became an issue after the alleged owners appeared in September 1994. There is no evidence that
Noble Kieschnick intended to hold the dogs for a reward or compensation when his wife "adopted"
the dogs. The only intentions involved in the circumstances of this case from the time the dogs
were found by Kathy Singletary's mother until Julie Kieschnick "adopted" the dogs from the clinic
were apparently to find a good home for the dogs.
     Theft is a serious crime involving moral turpitude which a person should not be branded with
under the circumstances of the acquisition of these dogs. The facts of Martin v. State, 44 Crim
538, 72 S.W. 386, 387 (1903), parallel the facts of this case. In that case, Mr. Martin found some
money and took it home to his wife to hold for safekeeping until he could get to town to seek
advice from the law officers in finding the owner of the money and at the same time to ask the law
officers' assistance in obtaining any reward that might be offered for return of the money. The
trial court had refused to grant Martin a continuance on the account of the absence of his wife who
was ill and who would have testified that Martin did leave the money with her under those
instructions. Martin's theft conviction was reversed for the reason that the trial court erred in
refusing to grant the continuance because the wife's testimony was material to his defense to show
that he did not hide or conceal the money and was willing to return it to the owner. See also 19
Tex. Jur. 3d Criminal Law § 568 (1982).
      Finally, the issue in this case is whether Noble Kieschnick committed theft by requesting
compensation before returning the dogs to the alleged owners. The Penal Code defines "Deprive"
as follows:
 
            (B) to restore property only upon payment of reward or other compensation; or
... 

Tex. Penal Code Ann. § 31.01(2)(B) (Vernon 1994). I believe the legislature intended that, for
a person to be guilty of theft where the prosecution relies on the definition of "deprive" as stated
above, that the accused must have the intent to hold the property for a reward or compensation at
the time he obtains the property. See Stepp v. State, 31 Crim 349, 20 S.W. 753 (1892)


; see also
19 Tex. Jur. 3d, Criminal Law § 568 (1982) (These code provisions [Tex. Penal Code Ann. 
§ 31.01(2)(B), supra] appear to codify prior decisional law, ...).
      In this case, there was no intent by Noble Kieschnick to hold these dogs for a reward or
compensation at the time his wife obtained the Chinese pugs. The dogs were obtained legally and,
in my opinion, after Noble Kieschnick gave his name and address to Deputy Ransom, there was
no hiding or concealment of the dogs. There being no evidence of intent to hold the dogs for a
reward or compensation when they were "adopted" by Julie Kieschnick, this should not be a
criminal case. At most, it is a civil suit for money damages and/or custody of the dogs. For these
reasons, I respectfully dissent and would reverse the theft conviction in this case.


 
                                                                               BOBBY L. CUMMINGS
                                                                               Justice

Dissenting Opinion delivered October 25, 1995
Do not publish Released for publication November 22, 1995. See Tex. R. App. P. 90(c)
[WITHDRAWN 11-22-95]